Mr. Justice Robb
delivered'the opinion of the Court:
Appellees make no question as to the right of the District to take the bond in suit, their sole contention being that the declaration states no breach of it. The first question, therefore, which logically presents itself, is whether, in an action •of this kind, where liability depends upon prescribed rules or regulations, recovery can be had unless such rules and regula *161 tions are pleaded. A careful review of the authorities leaves no room for doubt upon this question. The rule, as stated by Dillon in his work on Municipal Corporations, is that “the acts, votes, and ordinances of the corporation are not public matters, and must, unless otherwise provided by statute, be pleaded and proved.” 1 Dill. Mun. Corp. 4th ed. sec. 83. In Robinson v. Denver City Tramway Co. 90 C. C. A. 160, 164 Fed. 174, Judge Van Devanter, now Mr. Judge Van Devanter of the Supreme Court of the United States, said: “An ordinance is not a public statute, but a mere municipal regulation; and, to make it available in establishing a charge of negligence, it must be pleaded, like any other fact of which judicial notice will not be taken. Here it was not pleaded, and so could not be proven.”
“The general rule is well settled [citing cases] that municipal ordinances and by-laws are not laws of which judicial notice will be taken, but facts to be pleaded and proven. If not duly pleaded, they cannot be proven.” 28 Cyc. Law & Proc. p. 393.
In Stittgen v. Rundle, 99 Wis. 78, 74 N. W. 536, damages were sought for an alleged false imprisonment, and the trial court ruled that plaintiff’s arrest was without due process, and that he was entitled to recover damages from the officer arresting him. In the appellate court it was argued that this ruling was erroneous, owing to an ordinance of the city of Milwaukee, granting authority to policemen of that city to make arrests in cases of misdemeanor. The court said: “The ordinance was not mentioned in the pleadings or introduced in evidence, and first makes its appearance in the case when printed in appellant’s brief. The obligations of courts are sufficiently burdensome when they are required to take cognizance of all acts creating and granting powers to municipal corporations. They have uniformly refused to take notice of the acts and ordinance of such bodies except upon due proof. [Citations.] And the introduction of such an ordinance in evidence when not pleaded, against proper objection, is error.”
In Porter v. Waring, 69 N. Y. 250, it was said: “If tb.e court could take judicial notice of the ordinances of a municipal *162 corporation, it would involve the consideration of all the numerous enactments, whether printed or otherwise, which the common council have adopted, which relate to the subject of the controversy, and the existence of many of which might be entirely unknown to the parties or their counsel.”
While some of the cases hold that ordinances must be set out in hose verba, we think the general rule to be that it is sufficient to set forth their provisions in substance. Illinois C. R. Co. v. Ashline, 171 Ill. 313, 49 N. E. 521; Kip v. Paterson, 26 N. J. L. 298; Decker v. McSorley, 11 Wis. 91, 86 N. W. 554; Wagner v. Garrett, 118 Ind. 114, 20 N. E. 706; Lexington v. Woolfolk, 117 Ky. 708, 78 S. W. 910. They must be carefully identified, however, that they may be found without difficulty.
We will next review the history of the office of auditor and the rules and regulations governing the same, as given in the amended declaration. The act of July 7, 1870 (16 Stat. at L. 191, chap. 212), authorized the mayor and aldermen of the city of Washington to appoint an auditor and comptroller, and made it the duty of the auditor to audit and certify to the comptroller all accounts against the corporation, and to retain the originals of all contracts made and orders given for work and improvements by the District. It was the duty of the comptroller to keep an account of all warrants, of all taxes levied, and all receipts for taxes given by the collector and register. The act further provided that every account against the corporation of Washington, when audited and certified by the auditor, should be paid by warrant of the comptroller, countersigned by the mayor. The act provided, however, that all moneys received from any and all sources should be deposited by the collector and register to the credit of the city in a designated depository.
Under the act of February 23, 1871 (16 Stat. at L. 419, chap. 62, U. S. Comp. Stat. 1901, p. 677), the District of Columbia was created a body corporate for municipal purposes, and the power of election and appointment of municipal officers was lodged in its legislature, the act repealing the charter of *163 the city of Washington, and abolishing all offices of that corporation after June 7, 1871. The act of the legislative assembly of August 23, 1871 (Abert’s Compilation, page 210), made it the duty of the auditor to audit all accounts against the District, to keep a record of all bills certified by him and the appropriations to which they are chargeable, to certify to the comptroller all accounts audited by him, and to countersign all warrants drawn by the comptroller, if found correct. The comptroller was to keep an account of all appropriations made by the legislative assembly, and of all evidences of indebtedness issued by the District, to keep a transcript of all assessments of taxes, to charge to the respective appropriations all payments made upon certificates of the auditor, and to draw warrants upon the treasurer therefor if there was a balance to the credit of the particular appropriation.
The act of June 20, 1874 (18 Stat. at L. 116, chap. 337), abolished the existing form of government and established the present system. This act authorized the commissioners to abolish and consolidate offices and make appropriations thereto. The declaration alleges that the board of commissioners consolidated the office of auditor and comptroller and deputy comptroller by order of August 11, 1876, and by order of August 19, 1876, modified that order so as to continue the office of auditor and comptroller, and appointed one person to perform the duties of both offices. Under said order of August 11th, which is set out in the declaration, it is provided “that the clerk in the auditor’s office who shall be charged with the business of special assessments shall give a bond to the District of Columbia” for the faithful performance of his duties. Said order of August 19th provided that “the clerk in the auditor’s, office who shall be charged with the business of collecting and accounting for special assessments shall give a bond to the District of Columbia” for the faithful performance of his duties.
The act of June 11, 1878 (20 Stat. at L. 102, chap. 180),. continued the existing form of government by commissioners,, and provided that all taxes should be paid into the Treasury of the United States, and that the same, as well as appropria *164 tions to be made by Congress, should be disbursed for the expenses of the District on itemized vouchers, audited and approved by the auditor of the District, and certified by the commissioners or a majority of them.
The act of Congress of March 3, 1881 (21 Stat. at D. 466, chap. 134), provided that accounts of all disbursements of the commissioners of the District should be made to the accounting officers of the Treasury by the auditor on vouchers certified by the commissioners as required by law. The same provision is also contained in sec. 3 of the act of Congress of July 1, 1882 (22 Stat. at L. 144, chap. 263). These enactments were followed by an order of the commissioners dated December 8, 1882, abolishing the office of comptroller and imposing his duties upon the auditor.
Such was the situation when the bond was given. The declaration then sets out that on June 13, 1888, the commissioners passed an order containing seven sections. An inspection of the' order, which is made a part of the declaration, shows that under see. 1 the collector of taxes was required, upon receiving a deposit for permit work, etc., to give receipts therefor in duplicate, delivering the original to the depositor, and transmitting the duplicate to the auditor. This section forbids the collector • to pay out moneys thus received except upon requisition of the auditor, approved by the Commissioners. Section 2 of the order required the superintendents of streets and sewers, respectively, to prepare in duplicate pay rolls or other vouchers for services rendered or materials furnished, payable from the permit fund, which, after approval by the commissioners, were to be “forwarded to the auditor for audit and payment.” This section, however, was followed by sec. 3, requiring the auditor, after receiving a pay roll or other voucher prepared in accordance with see. 2, to examine and approve the same if found correct, and make requisition upon the collector of taxes for the amount thereof, as provided in sec. 1, and by sec. 4, specifying the manner in which these moneys should be paid and by whom. That section required “the pay clerk of the auditor’s office” to take the rolls thus prepared, with *165 the money necessary to meet the same, to the place where the work was being done, and to pay in cash to each claimant the amount his due. This pay clerk was required to give a bond for the faithful performance of the duties required of him. Section 5 required the auditor to open an account with the collector of taxes, debiting him with all deposits on account of permit work and license funds and subsequent deposits, crediting the requisitions honored by the collector. Section 6 required the auditor to debit himself with moneys received from the collector of taxes, upon requisitions made as provided in sec. 1, and to credit himself with payments upon vouchers duly certified and approved as in secs. 2 and 1. The seventh and last sections, which, however, is not here involved, required the auditor, after the completion of the work for which the deposits had been made, to state an account with the depositor, and make requisition for any balance or deposit, the receipt of the depositor being the auditor’s voucher for such payment.
What constituted “permit work,” the deposits on account of which made up the “permit fund,” is gathered from the statement in the declaration that, in the course of administration,, “the commissioners found it expedient that all work done by the District of Columbia as the result of cuts made in streets,, avenues, roads, and alleys in said District be paid from the fund known as the ‘Deposit and Assessment Fund,’ which was whole-cost work,” done at the solicitation of individual citizens, for’ their benefit and at their expense.
The act of Congress of March 3, 1891 (26 Stat. at L. 1064,. chap. 546), provided “for one disbursing clerk,” and authorized him to pay laborers and employees of the District, such payments to be made “with moneys advanced to him by the commissioners in their discretion, upon pay rolls or other vouchers audited and approved by the auditor of the District of Columbia, and certified by the commissioners as now required by law.” This disbursing clerk was required to give bond to the; satisfaction of the commissioners in the sum of $25,000, and. it was expressly provided that he should be subordinate to the’ commissioners, and that they should “in every respect be respon *166 sible to the United States, the District of Columbia, and to individuals for the acts and doings of the said disbursing clerk.” The accounts of this disbursing clerk were to be audited by the auditor of the District, who, however, was required to forward such accounts to the commissioners for their approval. This disbursing clerk, it is alleged in the declaration, was the officer designated in said order of June 13, 1888, as “Pay Clerk.”
The act of August 7, 1894 (28 Stat. at L. 247, chap. 232), provided for so-called “half-cost” work by requiring property ownei's desii’ing improvements under the permit system to deposit in advance with the collector an amoixnt equal to one half of the cost of such improvements. Moneys thus received by the collector were to be deposited by him in the Treasury of the United States, to the credit of the permit fund. Upon the completion of the work the commissioners were required to repay the current appropriation for assessment and permit work out of such permit fund, one half the cost of such work, and retuim to the depositors from the same fund any surplus remaining over and above one half the cost of the work. It will be noticed that this statute was not enacted until several years after the promulgation of said ox’der of June 13, 1888, and was authority for half-cost and not whole-cost work.
The declaration alleges that on the 6th of February, 1897, the commissioners passed an order providing that for convenience in keeping the account “in case of repairs made by the District of cuts in pavements and other work done by the District, which were paid for from private deposits, a general account be opened, styled ‘Deposit and Assessment Fund,’ and that all material and labor for such works to be charged against said account, and to be paid by assessments against the deposits made for such purposes.”
The act of June 30, 1898 (30 Stat. at L. 525, chap. 540), provided for the appointment by the commissioners of the District of a disbursing officer for the District, who was required to give bond in the sum of $50,000. This act expressly provided that thereafter advances in money should be made “on the inquisition of said commissioners to the said disbursing of *167 fieer instead of to the commissioners,” and required him to account for the same as then “required by law of the said commissioners.”
The only -other act necessary to be noticed is the act of July 1, 1902 (32 Stat. at L. 592, chap. 1352), requiring the auditor of the District to continue to prepare and countersign all checks issued by the disbursing officer, no check of such officer involving the disbursement of public moneys to be valid unless so countersigned.
It is, of course, axiomatic, that while duties akin to those expressly imposed upon a bonded officer may be subsequently devolved upon him so as to charge his sureties, duties of a wholly different character may not, the reason being that one class of duties may reasonably be presumed to have entered into the contemplation of the parties at 'the time of the execution of the bond, while the other class may not. Gassen v. United States, 97 U. S. 584, 24 L. ed. 1009; 2 Brandt, Suretyship & Guaranty, sec. 660. The question before us in this ease, however, is not so much whether there has been a breach of any after-imposed duties on the part of the auditor as whether, upon this record, it can be said that responsibility for the custody of the moneys mentioned in the declaration in any way devolved upon him.
It is so apparent, we think, as to render discussion unnecessary, that down to the promulgation of said order of June 13, 1888, there was no law, rule, or regulation making the auditor of the District custodian or accountable for public moneys. It is insisted by the appellees that the whole-cost work, to which the “permit work” deposit mentioned in this order was devoted, was entirely unauthorized by law, and hence that the ■order is not material here. We can find no statute authorizing the District to receive or expend such permit work deposits. On the contrary, the Commissioners were prohibited from contracting for improvement of streets, etc., “except in pursuance of appropriations made by law.” Abert’s Compilation, chap. 19, secs. 29, 31, pages 201-202. The order, therefore, has no place in this inquiry, as the moneys received from citizens for street *168 improvements were not public moneys in any legal sense. the transaction was between the individuals bolding the office of commissioner and the citizens who advanced the money.
the act of 1891, making appropriations “for one disbursing clerk,” provided that payments to laborers and employees should be made by such clerk with moneys advanced to him, not by the auditor, but by the commissioners. This disbursing clerk was also, under the act, required to give bond to the United States, and was made subordinate not to the auditor, but to the commissioners. • His derelictions the act expressly charged not to the auditor, but to the commissioners. the auditor was required to audit the accounts of this disbursing clerk, but again the act placed responsibility upon the commissioners by requiring the auditor promptly to forward such accounts to them for approval. From 1891 to the act of June 30, 1898, it is conceded there was no change in the method of disbursement. That act, as noted, created a disbursing officer for the District, required him to be appointed by the commissioners, and required him to give bond for the faithful performance of bis duties “in the disbursing and accounting, according to law, for all moneys of the United States and of the District of Columbia that may come into bis bands.” the proviso following, that advances in money should be made to the disbursing officer “instead of to the commissioners,” and that be should account for such moneys “as now required by law of said commissioners,” negatives the contention that it was then understood that advances bad previously been made to the auditor, and is in affirmation of the proposition that such advances bad previously been made to the commissioners.
the declaration specifically assigns, as the breach for which recovery is sought, the failure on the part of the auditor to account for certain checks alleged to represent moneys. the exact nature of these various transactions is set out in the declaration. There was no law making it the duty of the auditor to have the custody of or to disburse any of these moneys, nor does the declaration, as we have found, set out any prescribed rule, order, or regulation imposing said duties, or *169 either of them, upon the auditor. It follows, therefore, that, the demurrer was rightly sustained.
The refusal of the court to permit still further amendment, of the declaration is assigned as error. While it is difficult to perceive how the defect in the declaration could be overcome-by amendment, we are certainly not prepared to hold that there was an abuse of discretion by the trial court in overruling the* motion. Almost eight years had intervened since the filing of the original declaration. An oral motion for leave to file a third amendment was made, unaccompanied—so far as the-record discloses—by any showing of cause or by any suggestion as to the character of the proposed amendment. In the circumstances, the court was entirely justified in overruling the-motion.
Judgment affirmed, with costs. Affirmed.
A writ of error to the Supreme Court of the United States-was allowed, on application of the appellant.